*1290 The opinion of the court was delivered by
Nicholls, C. J.
The record shows shipments of fruit from Ne ^ Orleans to Pittsburg, Pa., at the dates mentioned in the petition. The bills of lading were issued from the office of the Northeastern Railroad Company. They acknowledge receipt by that company from the shipper in apparent good order of the packages mentioned therein (contents unknown), to be transported and delivered in like good order to their place of destination, subject to conditions noted in the bills. The conditions were:
“ 1. That the freight and charges thereon shall be paid by the consignee upon the delivery of the same in lots, or parts of lots, and within twenty-four hours after their arrival at their destination.
2. That articles agreed to be transported beyond the lines of the company may be delivered to connecting lines for transportation, and that upon such delivery the responsibility of this company shall cease, except as to guarantee of the rates of freight to be charged thereon.
“ 3. That this company and connecting lines shall not be liable for any breakage of glass or leakage of liquids, or for loss or injury resulting from the perishable nature or inherent defects of said packages or their contents.
“ 4. That this company and connecting lines shall be responsible as warehousemen only and not as common carriers, for the safety of said packages and their contents, while in the depot after arrival at their terminal stations.
“ 5. Claims for loss or damage must be made at the time of delivery of the goods to the consignee.
“ 6. Double the rate in the bill of lading will be charged on all excess in weight over that given by shippers.”
Across the face of the bills of lading are stamped the words: “ Leakage,” “ Breakage,” “ Wastage,” “ Decay, Chafing and Wet. Owner’s Risk.”
The bill of lading for the first shipment called for three hundred .and sixty-five boxes of lemons, instead of two hundred and ninety-¡seven boxes of lemons and sixty-eight boxes of choice oranges.
The fruit was shipped in fruit ventilator cars, not in ice or refrigerator cars. There is no charge in the petition that the cars were in bad •order at the time of departure from New Orleans, or that any defect .in the same or in their appliances which developed during the trip to *1291 Cincinnati, was attributable to any fault of the company. The car a were seen by the shippers and accepted, and one of their witnesses stated they were good cars. It is quite probable they knew nothing beyond the fact of their general appearance, for the report of their inspection at Cincinnati shows them to have been old cars in general bad condition, particularly car No. 2924, which was one of the two cars in which the second shipment was made, which was found to have a wrong pair of wheels, two wrong oil boxes, broken centre plates and broken draft timber bolts. The draw bars in both of the cars were liable to pull out, breaking the train in two and causing an accident.
The New Orleans & Northeastern Railroad Company, the Alabama Great Southern Railroad Company, and the Cincinnati, New Orleans & Texas Pacific Railroad Company are roads south of Cincinnati. The other roads appear to be separate, distinct corporations. What their special business arrangements with the other roads were does not appear. They acted as connecting companies on the occasion of these shipments, and seem to have for some time previous frequently transferred red cars, loaded with fruit, from Cincinnati to Pittsburg, but one of the witnesses testified that the companies south of Cincinnati had no authority to make contracts with shippers at New Orleans, binding the Baltimore, Ohio & Southwestern Railroad Company and the Baltimore & Ohio Railroad Company to carry fruit between Cincinnati and Pittsburg in any particular kind of car.
The Baltimore, Ohio & Southwestern Railroad Company has occasionally, not regularly, special fruit cars at their command. The testimony shows a tacit understanding resulting from custom between the New Orleans & Northeastern Railroad Company and shippers- of fruit from New Orleans northward, that the fruit would go on to destination in the car in which it was shipped without transfer, but with the understanding also that transfer should be made when cars break down, if they can not be repaired so as to run through.
The different roads at Cincinnati have at that point a joint inspection bureau for the purpose of inspecting cars brought there for the purpose of determining whether their condition is such as to justify their going forward. Under the rules the car is delivered to the connecting road, and if found in bad condition, not repairable in twenty-four hours, its contents are transferred to another car, and the defective car is returned to the company from which received.
*1292 When the cars in question (those of both shipments') reached Oincinnati they were found to be in defective condition, needing repairs before they could go further. They were accordingly transferred to another track for repair. The nature of the repairs was such as to require a detention of several days.
This fact carried with it the necessity of transferring their contents to other cars. When the first shipment reached Oincinnati the Baltimore, Ohio & Southwestern Railroad Oo. (the company which received it at that point and transferred the same to the Baltimore & Ohio Railroad Company), having no “ fruit ventilator’ ’ car to which the transfer could be made, ran an ordinary box car on a track parallel to that on which the New Orleans car was standing, threw a plank or planks across to make connections between the cars, and transferred the boxes of fruit over to the box car. The doors of the box ear were left partly open and slatted for ventilation, and on this car and on the same evening the fruit was shipped forward.
The difference between an ordinary box car and a ventilated fruit car is that the former, when closed, has no ventilation, while a fruit car is provided with ventilators on the sides of the car near the ends and ventilators in the door. When the second shipment reached Oincinnati the fruit was removed in boxes from the fruit cars in which they were, to cars of similar make, and in the same manner as the first shipment had been transferred, and after being so transferred were forwarded on the same evening to Pitts-burg. No “ delay” occurred in either of the shipments from the transfer's made or at any time from the defective condition of the cars. The usual time taken for the delivery of fruit from Oincinnati to-Pittsburg is about forty-eight hours. The first shipment reached Pittsburg on the morning of June 5. The consignee was notified of its arrival between seven and eight o’clock on the same morning. He called for the goods on the same day, but, according to the testimony of the local freight agent of the Baltimore & Ohio Railroad Company at Pittsburg, when the car was opened he objected, claiming that the fruit had started in an ice car from New Orleans, and as it had been transferred en route, it was damaged; that the fact that such transfer had been made had damaged the fruit. He refused to receive the lemons, and would not have them until he had communicated with the shipper at New Orleans. He left the station. The *1293 agent called on him the day following, but was unable to get any further information from him, and was compelled to leave the matter as it stood. The consignee claimed that owing to the fact that the fruit had been transferred to an ordinary box car it was made more susceptible to decay. The consignee and several of his employees examined the fruit. He refused to receive it upon first inspection, and declined to have anything to do with it, or give any instructions as to its disposal, or to aid, in any way, to take care of the fruit. It was unloaded from the car to the platform on the second day after its .arrival (June 7) and put in safety in the warehouse. After the consignee’s refusal to accept the fruit the company was compelled to dispose of the same at a forced sale, to the best advantage possible, in order to make out of it as much as possible. The Pittsburg Produce Commission Company sold the lemons and obtained gross receipts amounting to five hundred and eleven dollars and seventy-five cents. The expenses, drayage and commission amounted to seventy-three dollars and thirty-eight cents, leaving a net balance, which was paid to the company, of four hundred and thirty-eight dollars and thirty-seven cents, from which it deducted the freight charges, one hundred and fifteen dollars and fifteen 'cents, leaving a balance of two hundred and eighty-three dollars and twenty-two cents, which the company deposited in bank. The original cost of this fruit at New Orleans was five hundred and ninety dollars and thirty cents. The condition of the fruit of this shipment at Cincinnati was not shown.
The second shipment reached Pittsburg July 3. Eppleheimer (the local freight agent, whose testimony, in regard to the first shipment, we have just quoted) testified that the consignee wa9 notified the same day between seven and eight o’clock in the morning. The same day the consignee called and claimed that the fruit had been transferred from ice cars to fruit cars, and was, consequently, damaged. The consignee finally, on the 5th of July, took away the fruit. He claims that he did so under an agreement between some of.the employees of the Baltimore & Ohio Railroad that he should be permitted to do so; sell it to the best advantage he could, and be paid for whatever loss should be shown to have been suffered by reason of the condition of the fruit when received, but this is positively denied by the defendant and is not established. The fruit was, however, received under protest. The consignees sold the fruit at dif *1294 ferent dates at private sale, sometimes by the box, sometimes by the dozen. They introduced testimony to show that a large part of it had to be thrown away when in their hands by reason of its decayed condition. The dates of sales and names of purchasers are not given. It is shown that a part of the fruit was in their hands a very considerable time after they received it. The amount received from the sales amounted to five hundred and ninety dollars and ninety cents under the testimony.
Plaintiffs after receiving the fruit wrote the following letter to the Baltimore & Ohio Railroad Company:

To B. & O. Freight Agent:

Dear Sir — We shipped from New Orleans two car loads of seven hundred and fifty-seven boxes of lemons and seventy-one half boxes of oranges. This fruit was shipped from New Orleans direct to Pittsburg in cars Nos. 9224 and 9889. In place of that we received the fruit in a bad condition, the fruit having suffered from being transferred to other cars; we having received them from cars 15,794 and 15,064. Therefore we now claim one dollar on each box. We have lost much more, but we will be satisfied to arrange it that way, because if fruit had been shipped as per agreement it would have come in good order, as moving it is what spoils it.
Augustino Corso & Co.
In the examination of this case our attention was first directed to the claim of the plaintiff as against the Baltimore, Ohio & Southwestern Railroad Company and the Baltimore & Ohio Railroad Company. We find no liability on the part of either one of those companies. Plaintiffs’ pleadings show that they did not expect of the companies connecting with the New Orleans & Northeastern Railroad Company any duties other than that of receiving at Cincinnati the cars in which the fruit was packed at New Orleans and of transporting the same on to destination.
Plaintiffs themselves made no direct contract with those companies in regard to these particular shipments and the terms and conditions under which these various companies did business, among themselves, are not shown. It is shown, however, that the New Orleans & Northeastern Railroad Company had no authority to make contracts on their behalf with shippers at New Orleans, binding them to carry fruit between Cincinnati and Pittsburg on any particular *1295 kind of car. We think that the companies beyond Cincinnati, in their dealing with the companies south of that city, looked generally to hauling the latter’s cars and not to furnishing any of their own. That if called on to furnish cars of their own, it would simply be in some exceptional case or cases where a transfer of the contents of the cars of other companies to those of their own would become necessary, in consequence of the defective condition of those in which they arrived at Cincinnati. Cincinnati is not an initial shipping point for fruit going North or East, and the companies leading out of that city to the East are not called on to provide themselves with, and keep on hand, what is known as fruit ventilator cars, to meet the possible contingency of an accident, creating a special call for cars of that description.
When, on its being ascertained at Cincinnati that the cars on which these shipments of fruit were made were in a condition such as not to admit of their being carried further, application was made to the Baltimore, Ohio & Southwestern Railroad Company to ship the fruit to Pittsburg, the latter company could do nothing more than express a willingness to do so with the means it had on hand. The other companies were free either to accept or decline shipping it on such cars as that particular company had. If they thought proper to accept, they could not, afterward, bring forward as a ground of complaint against the forwarding company that their cars should have been fruit and not box cars, and if the companies south of Cincinnati could not themselves do this, so neither could the shipper at New Orleans. If any liability resulted from the mere fact of a transfer of the fruit from the cars belonging to the Northeastern Railroad to cars belonging to the, Baltimore, Ohio & Southwestern Railroad Company, or the mere fact itself of a transfer from a fruit car to a box car, it would be a liability not of the Baltimore, Ohio & Southwestern Railroad Company, but of the Northeastern Railroad Company to the plaintiffs. As a- matter of course, the Baltimore, Ohio & Southwestern Railroad Company and the Baltimore & Ohio Railroad Company would be liable for any damage resulting from their improper handling of the fruit, or for any other legal cause after they received the same. We find no evidence of fault on their part. The fruit was properly handled; the first shipment was as well ventilated as it could be made to be in a box car; the second shipment was in ventilated cars; both *1296 shipments went, without delay, to Pittsburg, and were there tendered for delivery. If there was any deterioration of the fruit between Cincinnati and Pittsburg, during the short time required for transmittal from one of these points to the other, it was due to causes for which the Baltimore, Ohio & Southwestern Railroad Company and the Baltimore & Ohio Railroad Company, under the bills of lading, were not liable, viz.: the perishable character of the articles themselves under the influence of the summer heat.
The testimony shows that fruits are perishable articles, greatly affected by heat, and more or less injury to it from that cause, in summer, is likely to occur.
'We are of the opinoin that the judgment appealed from, as it concerns the Baltimore, Ohio & Southwestern Railroad Company and the Baltimore & Ohio Railroad Company, is correct, and it is hereby affirmed.
We have next to ascertain whether the claim against the other companies be well founded or not. The Alabama Great Southern Railroad Company and the Cincinnati, New Orleans & Pacific Company seem to have taken no part in the matter of these shipments, other than that of hauling the cars of the Northeastern Railroad Company over their respective roads. There is nothing in the record to raise even a suspicion of fault on their part. The question then becomes narrowed between the plaintiffs and the New Orleans & Northeastern Railroad Company.
The bad condition of the cars on which the fruit was shipped at New Orleans when they reached Oincinnati is established by the testimony offered by the New Orleans & Northeastern Railroad Company itself. That bad condition had no effect upon the length of time the fruit was upon the road, either between New Orleans and Cincinnati or New Orleans and Pittsburg, but did have the effect of causing a transfer of the boxes of fruit from the cars of the New Orleans & Northeastern Railroad Company to those of the Baltimore, Ohio & Southwestern Railroad Company at Cincinnati. We think there was no damage done by the handling of the fruit at that point. It seems to have been transferred with care and without injury. We see no reason to suppose that the transfer made of the boxes of fruit of the second shipment to the cars of the Baltimore, Ohio & Southwestern Railroad Company from those of the New Orleans & Northeastern Railroad Company had changed the condition of the *1297 fruit from that in which it would have reached Pittsburg had the change not been made. The cars of the two roads in this instance were identical, all of them being fruit ventilator cars. The testimony shows what would not seem to be matter very difficult of proof, that the lifting of a number of boxes of fruit from one ear and taking the same across a plank a distance of fifteen or twenty feet over to another car and there depositing them would not pro-■duee any damage, where no physical injury was done in making the change. We think that any loss sustained by the plaintiffs, on the second shipment, was due to the perishable character of the article shipped under under the influence of the summer heat.
We next examine the effect of the transfer at Cincinnati of the boxes of the first shipment from the fruit ventilator car of the Northeastern Railroad to the box car of the Baltimore, Ohio & Southwestern Railroad Company. We think the condition of the fruit of this, shipment, when it reached Pittsburg, was worse than some of defendants’ witnesses claim it to have been. We notice an item of four dollars in the bill of charges of the Pittsburg Produce Commission Company in the matter of the sale of that fruit for hauling re-' fuse to dump, which is significant. Meyers, the president of that ■company, says the bulk of the lemons were in good condition; some ■of them almost worthless; the oranges almost worthless; good ■sound stock would have brought from fifty to seventy-five cents a box more than that for which they actually sold. What number of boxes were sold, either of oranges or of lemons, or at what rate per box [.they were sold, does not appear. The condition, however, would be -a matter of no moment, unless it resulted from some fact making the Northeastern Railroad Company responsible for it. Defendant calls •our attention to the fact that the condition of the fruit which was •shipped through from New Orleans to Pittsburg in the ventilator ears was no better than that forwarded from Cincinnati in the box •car, but it is not safe to reason from one of these shipments to the ■other — the conditions might have been different in the two cases. ■The short time, however, which elapsed between the placing of the fruit in the box carat Cincinnati and the arrival of that car at Pitts-burg disinclines us to attribute its final condition exclusively to the fact of its having been shipped in such a car. It is true, it was not fully ventilated, but the doors were left partially open and were slatted. It is probablethe condition may have been made worse by *1298 that fact, but how much more so we could not say. We are inclined to think it would have reached Pittsburg in a damaged condition, to some extent, even if no transfer of the cars had been made, and it is to be noted that several days elapsed after the fruit reached Pittsburg before the boxes were placed in the hands of the Pittsburg Produce Commission Company for sale, by reason of the action of the consignee in declining to receive it. It was the duty of the consignee to have received it and tested the liability of the defendant for the damage, if any had been sustained, as the acceptance of the goods would not have affected that question. Shaw vs. South Carolina Railroad Company, 5 Richardson’s Law Rep. (South Carolina) 462.
It would be an extreme ease which would justify a refusal by consignee to receive freight when notified (N. O., Jackson & Great Northern Railroad vs. Tyson, 46 Mississippi, 729). Even if the defendant were liable to plaintiffs, .the New Orleans & Northeastern Railroad Company would not be so as claimed. Plaintiffs practically make it a forced purchaser of the fruit at highest market rate (as estimated by themselves) at Pittsburg, and this without deduction of freight or anything else.
The District Court was of the opinion that the plaintiffs had not made out a case for damages, with a reasonable degree of certainty. We are asked to say it erred in that respect. We do not think we are authorized to do so. Certainly not as to the second shipment.
The transfer of the fruit to another car at Cincinnati was permissible under the custom, on which plaintiffs rely, if the condition of the car in which it was did not justify its going further, unless defendants were charged with fault in respect to that very matter. As we have said no such charge is made in the present pleadings, and plaintiffs themselves accepted the cars offered.
We think the ends of justice will be best subserved by affirming the judgment as concerns the second shipment of fruit, reversing it as to the first shipment, and entering a judgment of non-suit on that, branch of the case.
It is ordered, adjudged and decreed that the judgment appealed from be amended by dismissing as of non-suit, Instead of rejecting finally, so much of plaintiffs’ demand as refers to the shipment of fruit made by them on the 30th of May, 1892, through the New Or *1299 leans & Northeastern Railroad Company, and that, as so amended,, the judgment appealed from be and the same is hereby affirmed; cost of appeal to be paid by appellee.